**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Gabriel ALVAREZ, Gustavo Holguin, Leovigilda Rivera, Humberto Olivares Castrellon and Oneyda Zambrana, Defendants–Appellants.**

**Nos. 86–2709, 86–2710, 86–2805, 86–2846 and 86–2847.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1988.

Decided Oct. 20, 1988.

Suzanne Philbrick, Oak Lawn, Ill., Ken DelValle, Sheila M. Murphy, Chicago, Ill., Joshua Sachs, for defendants-appellants.

Helene B. Greenwald, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Five individuals appeal their convictions for violations of various provisions of the federal narcotics laws. We reverse Gustavo Holguin's continuing criminal enterprise conviction on the ground of insufficient evidence. We vacate Humberto Castrellon's sentence. Both Mr. Holguin and Mr. Castrellon must be resentenced by the district court. In all other respects, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. *Procedural Posture*

On May 5, 1986, a federal grand jury returned a fourth superseding 120–count indictment against eleven defendants, including the five appellants. Basically, the indictment alleged six different types of crimes, all related to the distribution and sale of narcotics. First, it alleged a narcotics distribution conspiracy in violation of 21 U.S.C. § 846. Specifically, it charged the defendants with conspiring (1) to possess with intent to distribute heroin, cocaine, and marijuana; and (2) to use interstate telephone to facilitate the distribution. Second, the indictment charged a violation of one section of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c). This count alleged that the defendants (1) formed an "enterprise" for the purpose of illegally trafficking in narcotics, and (2) conducted the affairs of

the enterprise through a "pattern of racketeering activity." The pattern of racketeering activity consisted of multiple "offenses" and "acts" concerning the receipt, concealment, purchase, sale and otherwise involvement in narcotics. Third, the indictment alleged that some of the defendants violated 21 U.S.C. § 848, the continuing criminal enterprise (CCE) or "kingpin" statute. Fourth, the indictment charged several of the defendants with distribution of narcotics, and/or possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Fifth, several of the defendants were charged with using the telephone both to facilitate the conspiracy to distribute narcotics and to facilitate the actual distribution of narcotics in violation of 21 U.S.C. § 843(b). Sixth, and finally, two of the defendants, Mr. Holguin and Mr. Castrellon also were charged with traveling in interstate commerce to facilitate the unlawful activity of narcotics distribution in violation of 18 U.S.C. § 1952(a).

Of the eleven defendants originally charged in the indictment, eight were tried together.[1] Five of the eight now appeal. The trial commenced on May 15, 1986 and concluded on July 23, 1986. The jury returned a verdict of guilty on all counts for all of the appellants except for Oneyda Zambrana who was found not guilty of count 19 (alleging the use of a telephone to facilitate a narcotics crime). All of the appellants filed a timely notice of appeal.

### B.  *Facts*

This case is the culmination of an extensive undercover and surveillance operation conducted by federal agents in Chicago, Illinois from approximately April 2, 1985 through July 23, 1985. The investigation uncovered evidence that the defendants were engaged in a conspiracy to deal principally in cocaine and, to a lesser extent,

heroin and marijuana. During the investigation, agents of the Drug Enforcement Administration (DEA) purchased narcotics from some of the defendants. Agents of the Federal Bureau of Investigation (FBI) and the DEA also engaged in electronic surveillance of telephones at Rudy's Service Station and an apartment on South Whipple Street in Chicago. In addition, the agents conducted physical surveillance of these same two locations. The central figure in the operation was DEA Agent Raleigh Lopez, who posed as a narcotics dealer named Jimmy. On fourteen occasions he obtained cocaine and/or heroin from defendants Juventino Herrera–Rivera (Juventino) (not an appellant) and/or Gabriel Alvarez (an appellant), totaling almost ten pounds.

### C.  *Trial Presentation of the Evidence*

At trial, the government presented the evidence that was obtained from the undercover investigation in chronological order, proceeding transaction by transaction. Agent Lopez initially testified about each such transaction. Subsequently, a surveillance agent, or agents, who had observed either the transaction or the events surrounding it, also would testify. The agents so corroborating Agent Lopez' testimony varied from transaction to transaction. Occasionally, some of these other undercover agents accompanied Agent Lopez to purchase narcotics. Several of the transactions also were videotaped and/or photographed. The government introduced these videotapes and photographs into evidence. Finally, the surveillance agents recorded a good deal of telephone conversations.[2] These conversations, principally in Spanish, were recorded onto reel-to-reel tapes. Some of these tapes then were reproduced onto cassettes. The cassettes, in turn, were translated into English tran-

1.  The three defendants not tried were (1) Rodolfo Herrera–Medina, the reputed "top man" in the conspiracy, who was never apprehended; (2) Juan Rivera, who appeared for arraignment, was released on bail, but never appeared for

trial; and (3) Antonio Lopez, who pleaded guilty and testified as a government witness.

2.  The videotapes and telephone recordings taken at Rudy's Service Station and the South Whipple Street apartment are referred to

scripts.[3] These English transcripts, along with the reel-to-reel and cassette tapes, were introduced into evidence and the transcripts were read to the jury. According to the government, the recorded conversations were in a code typically used by drug dealers to disguise the illegality of their business.

## II

### DISCUSSION

#### *Voice Identification Evidence*

A. *Foundation for Admission*

1. Contentions of the Parties

Appellant Gustavo Holguin, joined by Leovigilda Rivera (who adopts the arguments presented by Mr. Holguin), contends that the government failed to lay a proper foundation to identify the appellants as those whose voices were recorded. He specifically contends that the manner of the recording—telephone to reel-to-reel tape to cassette—was insufficiently accurate to identify the speakers. He then submits, essentially, that the government's voice identification witnesses failed to authenticate the recorded conversations as being between the defendants. For instance, he contends that the witnesses (1) did not testify as to "what specific tapes ... they listened to when they identified the voices in question," Holguin's Br. at 79; (2) did not testify as to "when, where, how or who else was present when they heard what ever [sic] tapes they heard," *id.;* and (3) did not listen to tapes in open court for identification before the jury.

In contrast, concerning the accuracy of the recordings, the government contends that there was ample evidence to establish that every piece of equipment involved in the production of the tapes worked properly in producing an accurate recording of the appellants' voices. As to the authenticity of the recordings, the government contends that the issue was never raised before the district court and, therefore, that the argument is waived on appeal. On the merits, the government argues that its witnesses had sufficient familiarity with Mr. Holguin's and Ms. Rivera's voices to identify them as speakers on the tapes.

2. Analysis

Upon reviewing the record, we believe that Mr. Holguin preserved, albeit marginally, all these issues. Accordingly, we address their merits.

We previously have held that "[t]ape recordings are only admissible if the Government can establish, by clear and convincing evidence, that the recordings are 'true, accurate, and authentic recording[s] of the conversation[s], at given time[s], between the parties involved.'" *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985) (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984)). The district court must determine whether "the recordings involved conversations that occurred between defendants in this suit." *Id.*

Here, the district court determined that the government had met its burden and admitted the voice recordings and transcripts into evidence. It is well established that a district court's general evidentiary rulings will be reversed only upon a showing of clear abuse of discretion. *United States v. Garner*, 837 F.2d 1404, 1416 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *Davis v. Lane*, 814 F.2d 397, 399 (7th Cir.1987); *accord Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1266 (7th Cir.1988). This standard also governs our review of a district court's decision to admit voice recordings. *Faurote*, 749 F.2d at 43; *see United States v. Hughes*, 658 F.2d 317, 322 (5th

---

throughout as the Rudy tapes and the Whipple tapes, respectively.

**3.** Both parties represent that the transcripts were made from the cassettes. *See* Holguin's Br. at 36–37; Appellee's Br. at 23 n. 29. These representations conform to the great bulk of the evidence. *See, e.g.,* Tr. vol. 10 at 1835–36.

However, Agent Hernandez testified that the transcripts were made from the reel-to-reel tapes. *Id.* at 1700. He also testified, however, at least with respect to the Rudy tapes, that the cassettes accurately reproduced the content and voice quality of the reel-to-reel tapes. Tr. vol. 9 at 1690.

Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *United States v. Blakey,* 607 F.2d 779, 787 (7th Cir.1979).

### a. true and accurate recordings

■ The government presented clear and convincing evidence to show that the conversations were recorded truly and accurately. First, it demonstrated that the lines used in the wiretapping of Rudy's Service Station and the South Whipple Street apartment were "voice quality" lines. Ronald Kwasny, a security manager for Illinois Bell Telephone Company (Illinois Bell), testified that a voice quality line is of the same quality as a residence or business telephone line. Mr. Kwasny testified that Illinois Bell makes it a routine practice to test such a line to ensure that it meets its "design or engineering standard" before giving it to the DEA or FBI. Tr. vol. 9 at 1644. Second, the government demonstrated that it is the routine practice of both agencies to test the equipment involved in a wiretap prior to its use. Third, agents listened to the conversations while they were being recorded; they reported no malfunctions in the equipment.[4] Fourth, agents who listened to each stage of the recording process testified that the cassettes—from which the transcripts were made[5]—accurately reproduced the voices on the original reel-to-reel recordings of the telephone conversations.[6] And fifth, witnesses who knew either Mr. Holguin or Ms. Rivera testified that the taped voices were an accurate representation of the appellants' own voices.[7]

In contrast, the only evidence introduced by the appellants that contradicts these submissions was the testimony of a former Illinois Bell employee, Stanley Salter. Mr. Salter testified that a human voice has much greater range than the capability of telephone equipment to capture and reproduce the voice. However, he also testified on cross-examination that telephone equipment essentially can transmit the "fundamental frequency" of a human voice. In addition, he opined that, although some conversations contained distortion due to poor recording techniques, he "heard no noise that would be caused by, [malfunction of] 'Telephon[ic equipment.]' " Tr. vol. 29 at 5404.

### b. authenticity

Concerning the authenticity of the speakers' voices on the tapes, both Mr. Castrellon and Mr. Alvarez stipulated that "Government Exhibits Rudy's 1 through 110 correctly identified the speakers in those conversations, including the defendants where the names appear as a speaker...." Tr. vol. 9 at 1602. A similar stipulation applies concerning the Whipple tapes. In addition, both Mr. Holguin and Ms. Rivera stipulated to the correctness of all voices but their own.

Moreover, we find abundant evidence in the record to refute squarely the contentions raised by Mr. Holguin. Rule 901 of the Federal Rules of Evidence provides guidelines for authenticating voices as a precondition for admissibility of evidence. The rule provides in relevant part:

(b) *Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

(5) *Voice identification.* Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time

---

**4.** DEA Agent John T. Ragan did report a single instance of a garbled recorded message. However, this isolated malfunction was explained as a simple "Power surge." Tr. vol. 9 at 1605, 1631, 1640.

**5.** *See supra* note 3.

**6.** DEA Agent Ralph Arroyo testified that one of the Whipple cassettes had "about a three-second discrepancy" in it. Tr. vol. 24 at 4327. However, when questioned whether voices on the cassettes sounded the same as the voices on the original tapes, Agent Arroyo responded that the voices were "exactly" the same. *Id.*

**7.** *See infra* at p. 809.

under circumstances connecting it with the alleged speaker.

Fed.R.Evid. 901(b)(5). As the advisory committee notes further clarify, "[s]ince aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired *either before or after the particular speaking which is the subject of the identification....*" Fed.R.Evid. 901 advisory committee's notes (emphasis supplied). Courts interpreting this Rule have accepted its plain meaning. *See, e.g., United States v. Cerone,* 830 F.2d 938, 949 (8th Cir.1987) ("Any person may identify a speaker's voice if he has heard the voice at any time."), *cert. denied,* ___ U.S. ___, 108 S.Ct. 1730, 100 L.Ed.2d 194 (1988); *United States v. Gironda,* 758 F.2d 1201, 1218 (7th Cir.) (witness was familiar with voice of defendant based on at least three conversations prior to telephone call at issue), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985); *United States v. Cambindo Valencia,* 609 F.2d 603, 640 (2d Cir. 1979) (witness properly identified defendant based on listening to voice exemplar), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Watson,* 594 F.2d 1330, 1335 (10th Cir.) (witness may identify defendant based on conversations held "either before or after the particular speaking which is the subject of the identification"), *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979).

■ Here, the government introduced testimony from three witnesses: FBI Agent John Edward Hernandez; Jose Buergo, an assistant professor of Spanish at the University of Illinois; and Gladys Wilson, a former romantic interest of Mr. Holguin. Concerning Mr. Holguin, Agent Hernandez testified that he conversed with the appellant in Spanish for "approximately four to five hours," tr. vol. 9 at 1674–75, and that he heard Mr. Holguin testify at a pretrial hearing for an additional forty-five minutes. Agent Hernandez also testified that he listened to the tape recordings "[i]n excess of five [hundred] to 600 hours." *Id.* at 1670. Based on this foundation, he then expressed his opinion that "the transcripts correctly identified Gustavo DeJesus Holguin." *Id.* at 1676. Moreover, Gladys Wil-

son testified that, based on numerous in-person and telephone conversations with Mr. Holguin, his voice is one "that I will never forget." Tr. vol. 24 at 4315. She indicated that when she listened to several of the tape recordings at issue, she recognized Mr. Holguin's voice. She then informed an FBI agent of her identification and he initialed those tapes.

■ As to Ms. Rivera, both Agent Hernandez and Professor Buergo conversed with her and, at that time, obtained a recorded voice exemplar of her speech. They then compared their conversations and the exemplar with the voices on the cassettes. Like Agent Hernandez, Professor Buergo spent considerable time reviewing the tapes —"[a]pproximately 300 hours." Tr. vol. 10 at 1840. At trial, both of these witnesses testified that Ms. Rivera properly was identified on the transcripts of the tape recordings.

Although only a "[m]inimal familiarity is sufficient for admissibility purposes," *Cerone,* 830 F.2d at 949, the government witnesses had considerable opportunity to become acquainted with the voices of the appellants. "Attacks on the accuracy of the identification go to the weight of the evidence, and the issue is for the jury to decide." *Id.; see United States v. Smith,* 635 F.2d 716, 719 (8th Cir.1980). Accordingly, the district court properly admitted the tapes and the transcripts into evidence.

### B. *Fifth Amendment Due Process Claim*

#### 1. Contentions of the Parties

Despite the proper foundation for admissibility of the voice identification evidence, Mr. Holguin contends that the testimony of the government witnesses violated the appellants' fifth amendment due process rights. He submits that the voice identification procedure was impermissibly suggestive: "[P]rior to hearing any of [the] defendants' actual voice[s] both Hernandez and Buergo had spent hundreds of hours listening to tapes with transcript in hand and those transcripts had already had the alleged speaker designated." Holguin's Br. at 77.

The government contends that Mr. Holguin has waived this issue because it was not raised before the district court. In addressing the merits, the government submits that the due process considerations prohibiting certain kinds of identification evidence apply only to methods that might produce a likelihood of misidentification. It argues that the same concerns are not present when voice identification is made in the manner done here; the voices of the parties who committed the crimes were memorialized on recorded tape. Because no memory was involved, the government submits that there was no substantial likelihood of misidentification and the due process considerations governing such an identification should not apply.

### 2. Analysis

■ While it is not entirely clear that Mr. Holguin properly preserved this contention, we believe that the state of the record (which comprises approximately 7000 transcribed pages and several hundred more of exhibits) warrants our addressing the merits of Mr. Holguin's due process argument.

We previously have joined other circuits in holding that voice identification, like other forms of identification, should be subject to a due process analysis to ensure that the identification was not unduly suggestive. *See Israel v. Odom*, 521 F.2d 1370, 1374–75 (7th Cir.1975); *see also United States v. Patton*, 721 F.2d 159, 162–63 (6th Cir.1983); *United States v. Schultz*, 698 F.2d 365, 367–68 (8th Cir.1983); *United States v. Pheaster*, 544 F.2d 353, 369 (9th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). The Eighth Circuit recently has summarized the applicable due process analysis for in-court identifications:

> The linchpin in determining the admissibility of identification testimony in a criminal trial is reliability. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). If the identification procedure used is unduly suggestive, it deprives the defendant of a fair trial and due process of law. *Id.* at 102–14[, 97 S.Ct. at 2246–53]. An identification procedure is impermissibly suggestive if it gives rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed. 2d 1247 (1968). The court must determine whether under "the totality of the circumstances" an identification is reliable. *Stovell v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

> *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). "Against these factors is to be weighed the corruptive effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253.

*Little v. Armontrout*, 819 F.2d 1425, 1433 (8th Cir.), *vacated on other grounds*, 835 F.2d 1240 (1987) (en banc), *cert. denied*, ——— U.S. ———, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988).

Applying these factors to the instant case, it is apparent that neither Mr. Holguin's nor Ms. Rivera's due process rights were violated. The identification procedures were reliable. First, as already noted, the government witnesses had ample opportunity to review the voices of the appellants. Agent Hernandez spent several hours speaking in Spanish with Mr. Holguin prior to trial. In addition, Gladys Wilson identified Mr. Holguin's voice on many of the cassette tapes. Concerning Ms. Rivera, both Agent Hernandez and Professor Buergo had exemplars of the appellant's voice which they were able to compare with the voices on the Rudy and Whipple tapes. Apparently, they reviewed these tapes a number of times, collectively spending at least 800 hours so doing. Sec-

ond, Agent Hernandez and Professor Buergo's identifications were obviously the product of careful study. We find no evidence that they did not give careful attention to the voice identification process. *See Brown v. Harris*, 666 F.2d 782, 786 (2d Cir.1981) ("Witnesses who listen to a crime that has been 'memorialized on tape,' *United States v. Aiken*, 491 F.Supp. 37, 38 (S.D.N.Y.) *aff'd mem.*, 639 F.2d 769 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981), are in a position to offer uniquely reliable testimony.... [T]hey have the luxury of listening to the tape in an office, where they can devote their full attention to it...."), *cert. denied*, 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982). Third, their testimony at trial indicates that Agent Hernandez, Professor Buergo and Gladys Wilson all were quite positive that the voices on the tapes were those of the appellants. And fourth, Agent Hernandez was in the process of reviewing approximately half of the reel-to-reel tapes during the time that he conversed with Mr. Holguin. As a result, there was no prolonged interval between the conversation and the recorded review. As to Ms. Rivera, because the identification of her voice was made pursuant to an exemplar, she cannot argue that the witnesses' memories faded over time.

█ Finally, given the overwhelming evidence presented by the government that the transcripts properly identified the speakers, "[i]t follows, as a matter of logic, that, even if arguably suggestive, the pretrial identification could not have given rise to a substantial likelihood of irreparable misidentification." *Patton*, 721 F.2d at 163. Accordingly, we hold that the voice identification procedures employed by the government did not violate the appellants' fifth amendment due process rights.[8]

## C. Sixth Amendment Right to Confront Witnesses

### 1. Contentions of the Parties

Mr. Holguin next contends that the voice identification procedures violated the appellants' sixth amendment right to confront witnesses against them. Specifically, he challenges the method by which the cassette tapes, recorded in Spanish, were translated into English and written out in transcript form. He submits that, because each translator of each tape did not testify at trial as to the true and accurate representation of the tapes that they translated, the appellants were denied the right to confront the translators. He also argues that the appellants were denied the right to cross-examine the individuals who affixed the names of the defendants onto the transcripts prior to giving them to Agent Hernandez and Professor Buergo. Thus, he submits, the appellants were unable to inquire as to how the defendants were so identified.

The government again contends that this issue was waived. In the alternative, it argues that Mr. Holguin had the opportunity to cross-examine Agent Hernandez and Professor Buergo who testified that the transcripts accurately reflected the conversations on the cassettes. In addition, the government submits that Agent Hernandez and Professor Buergo testified, subject to cross-examination, that the names of Mr. Holguin and Ms. Rivera were affixed properly on the transcripts.

### 2. Analysis

█ Again, while it is not entirely clear that Mr. Holguin properly preserved this

8. The appellants also contend that giving the transcripts to the jury with the names of the defendants beside the cassette translations impermissibly suggested the identity of the speakers without proper foundation. There is no merit to this assertion. While the transcripts were being read in open court, it was the contention of the government that the names beside the conversations accurately reflected the speakers; it was the appellants' contention that they did not. Yet as already noted, both Mr. Holguin and Ms. Rivera stipulated that the transcripts accurately reflected the voices of the other appellants. In addition, the other appellants stipulated that Mr. Holguin and Ms. Rivera were accurately identified on the transcripts. Moreover, before publication of one of the transcripts to the jury, the district court cautioned: "[T]he identification of speakers [on the transcripts] ... has been contested by the defendants, and it is ultimately going to be for you to decide whether or not the transcript is accurate in terms of its identity of the speaker or not...." Tr. vol. 14 at 2393.

contention, we address his argument for the same reasons set forth above concerning his fifth amendment claim. Mr. Holguin's sixth amendment challenge is without merit. As already noted, the foundation of the voice identification evidence was proper. Concerning the accuracy of the transcripts, Professor Buergo testified that he had reviewed all of the recordings for accuracy and found that they were true and accurate representations of the taped conversations. The only evidence offered to rebut Professor Buergo's testimony was testimony from Lucracia Gonzalez, a translator for the Chicago Board of Education. Based on her study of a small portion of the voluminous transcripts and the accompanying tapes, she opined that the translations of the cassettes generally did "not grasp the tone or the message on the Spanish conversations." Tr. vol. 30 at 5632. However, when the government cross-examined her, Ms. Gonzalez revealed that the errors in the government translations consisted primarily of incorrect verb tenses, shifting pronouns, using harsh language rather than mild language, and making minor, nonmaterial word changes that did not alter significantly the meaning of the conversations. The conflicting testimony of Professor Buergo and Ms. Gonzalez, which was subject to cross-examination, was weighed and assessed by the jury in reaching its verdict. Such a credibility determination is uniquely for the jury.

As to the individuals who initially affixed the names of the speakers to the transcripts, both Agent Hernandez and Professor Buergo testified on the basis of voice exemplars, personal knowledge, or both, that the names on the transcripts properly identified the speakers on the cassettes. Similarly, Ms. Wilson had substantial prior contact with Mr. Holguin on which to base her voice identification of him. All of this in-court testimony was subject to cross-examination by Mr. Holguin and the other appellants.[9]

## Sufficiency of the Evidence

### A. Gustavo Holguin

Mr. Holguin also raises several arguments that challenge the jury's verdict on the ground that the evidence was insufficient to support his conviction. Specifically, he makes three such challenges: (1) the government relied exclusively on evidence in the Rudy and Whipple tapes, which he submits, incorrectly were admitted into evidence; (2) the government failed to prove that the conversations allegedly involving Mr. Holguin discussed narcotics; and (3) the government failed to prove the specific elements of the CCE charge.

As we have held consistently in addressing sufficiency of the evidence challenges, our standard of review is: "Viewing the evidence in the light most favorable to the prosecution, could any rational trier of fact have found the defendants guilty beyond a reasonable doubt?" *United States v. Garner*, 837 F.2d 1404, 1422 (7th Cir.1987), *cert. denied*, ―― U.S. ――, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In other words, " '[i]t is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.' " *United States v. Kord*, 836 F.2d 368, 371 (7th Cir.1988) (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), *petition for cert. filed* (May 16, 1988).

1.

Mr. Holguin was convicted of one count of a narcotics conspiracy, one count of a RICO enterprise, one count of a CCE, two counts of interstate travel facilitation, and nineteen counts of telephone facilitation. His initial challenge is that the guilty verdicts on all of these crimes, ex-

---

9. Mr. Holguin also contends that the trial judge improperly allowed Agent McAlexander to testify that Ms. Wilson exclaimed "that's his voice," when she heard Mr. Holguin's voice on the tapes. However, the district court gave a cautionary instruction that the jury could only consider what the agent heard and what he did in response; they could not consider it for the truth of the statement.

cept for the CCE count, were based solely on the Rudy and Whipple tapes. Because he contends that the admission of the tapes violated his constitutional rights, he submits that these verdicts also should be reversed. As already noted, however, the government's voice identification evidence properly was admitted. Moreover, Mr. Holguin does not contend, for the most part, that, even if the tapes were properly admitted, the evidence was insufficient to support the jury's verdict. Concerning the telephone facilitation counts, Mr. Holguin does contend that "even if for the sake of argument we agree that Holguin was the voice on the transcripts—there was no evidence at the trial that Holguin was ever in possession of a narcotic substance with the intent to distribute or deliver, nor was there any evidence of a delivery of narcotics by Holguin." Holguin's Br. at 90. Mr. Holguin relies on a United States District Court for the District of Delaware decision for his support. *See United States v. Leslie*, 411 F.Supp. 215 (D.Del.1976). In *Leslie*, the district court held that the defendant could not be convicted for telephone facilitation crimes under 21 U.S.C. § 843(b) unless the government proves an actual distribution of narcotics. Here, Mr. Holguin was not charged with actual distribution of narcotics in violation of 21 U.S.C. § 841. However, the actual distribution of narcotics need not be perpetrated by the defendant charged with the crime of telephone facilitation. As the Fifth Circuit aptly summarized the crime of telephone facilitation under 21 U.S.C. § 843(b):

> In order to prove a violation of 21 U.S.C.A. § 843(b), the Government must establish that the defendant knowingly and intentionally used a communications facility, *e.g.*, a telephone, to facilitate the commission of a narcotics offense. In order to establish the facilitation element, the Government must show that the telephone call comes within the common meaning of facilitate—"to make easier" or less difficult, or to assist or aid. *It is sufficient if a defendant's use of a telephone to facilitate the possession or distribution of controlled substances facilitates either his own or another person's possession or distribution.*

*United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir. Unit B 1981) (emphasis supplied), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *see United States v. Watson*, 594 F.2d 1330, 1342 n. 14 (10th Cir.) (defendant could be charged with telephone facilitation if underlying distribution was by either himself or third party), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979). Accordingly, there is no merit to Mr. Holguin's contention on this issue. For the reasons set forth previously, we find that the evidence was sufficient to support the jury verdict.

2.

Mr. Holguin's next contention is that "[n]one of the conversations on [sic] which Defendant Holguin was the alleged speaker mentioned any narcotics." Holguin's Br. at 88. We initially note with respect to the appellants collectively, including Mr. Holguin, that the government presented testimony at trial from DEA Agent Ralph Arroyo, an experienced undercover detective. Agent Arroyo testified that narcotics conspirators use code words as a matter of course in transacting their illicit business. For example, the words "girl, white, shirt—those are about the most common ones that are used [to mean cocaine]." Tr. vol. 24 at 4343. Agent Arroyo then went on to testify that "[y]ou can tell [that a word is a drug reference] by putting the word that they are talking about into the context of the whole telephone call conversation." *Id.* As he further testified:

> [I]f it is a person with a business, let's just say a grocery store owner, if I was talking to him on the telephone and I wanted to order some cocaine, he might say, "Do you want to buy one onion," referring to onion being white and that being cocaine.
>
> If I wanted to buy some, let's say, heroin, he would say, "Do you want to buy one avocado," being dark, being the heroin.

*Id.* at 4351–52. Thus, where an Italian-cuisine restaurateur was conducting a narcot-

ics transaction on the telephone with one of the appellants, the restaurateur testified that his use of the words "food" and "spaghetti" were code words for cocaine. Tr. vol. 27 at 5003 (testimony of Sebastiano Ganci).

Concerning evidence offered directly against Mr. Holguin, the government introduced a transcript of a conversation between Mr. Holguin and Rudy in which Mr. Holguin informed Rudy that "[t]oday I couldn't get but two boxes of filters, you know?" Tr. vol. 13 at 2317; Appellee's Ex. Whipple 5.[10] The government contends that the reasonable inference of the code words "boxes" and "filters" is cocaine. Support for the government's position is found in the same conversation. For instance, Mr. Holguin told Rudy that a future shipment of "boxes" will cost "around eight and a half." Id. At trial, Agent Arroyo testified that if the price of cocaine was $38,000, the seller "could either say to me, 'It's 38.' He could say to me, 'It's 800.' He could say to me, 'It's 8,' and I would understand that that one kilo is going to cost me $38,000." Tr. vol. 24 at 4354.

In another conversation between Mr. Holguin and Rudy, Mr. Holguin said, "I'll make a special flight and bring you a sample so you can see it, analyze it." Rudy responded, "[g]o on then, but send me something to mix with this, so that together they come out." Appellee's Ex. Rudy 51 at 5. We think that a reasonable jury could easily have inferred from this conversation that Rudy was disappointed with the quality of cocaine that previously had been supplied by Mr. Holguin. Accordingly, Mr. Holguin was sending Rudy a sample of purportedly better quality cocaine. It also suggests that Rudy wanted some substance to mix with the inferior cocaine to make it more salable.

At trial, the government also introduced conversations between Mr. Holguin and Mr. Castrellon in which the appellants speak of conducting alcohol and temperature tests on a "material." Specifically, Mr. Holguin noted to Mr. Castrellon that the "material," when a thermometer was applied to it, "marked one hundred eighty (180)." Mr. Holguin then said, "[t]hat comes out perfect." He also noted that the "alcohol came out perfect too." Next, Mr. Holguin noted that after conducting a "devolution" test, "it turn[ed] into a paste ... bad quality, something different...." Finally, Mr. Castrellon inquired about "bicarbonate." Mr. Holguin responded that "we do it with the ammonia." See Tr. vol. 18 at 3189–90; Appellee's Ex. Rudy 48.

The government then called DEA forensic chemist Scott Masumoto to testify. Agent Masumoto testified that two methods used to test a substance for cocaine involve temperature and alcohol. In regard to the temperature test, Agent Masumoto stated that a 180–degree melting temperature for cocaine "would indicate that it was still relatively pure." Tr. vol. 20 at 3390. He then testified that, in converting cocaine hydrochloride (sniffed through the nose) to cocaine base (smoked), one generally adds "ammonia or sodium bicarbonate" and an "organic solvent" to a hydrochloride and water solution. Id. at 3394. He also testified that, in converting this solution to cocaine base, under certain circumstances, the base can result in a "pasty" quality. Id. at 3396.

Finally, the government introduced evidence that Mr. Holguin, and some of the other appellants, used coded telephone numbers to conceal further their narcotics transactions. For instance, after cracking the code, the telephone numbers were traced either to hotels where Mr. Holguin was staying, or to Mr. Holguin's Miami, Florida residence. Accordingly, viewing the evidence in the light most favorable to the government, we cannot say that the jury incorrectly inferred that the coded telephone conversations introduced by the

10. At trial, the government prosecutors read the transcripts of the taped telephone conversations to the jury. The official trial transcripts, however, refer only to the names of the prosecutors as they read from the tape transcripts. Consequently, it is difficult to follow exactly which appellant allegedly is speaking. To alleviate any problems in this regard, we have included the citation to the government's tape transcript exhibits that were introduced into evidence. These exhibits contain the names of the alleged speakers noted in the margins.

government referenced dealings in narcotics.

### 3.

Mr. Holguin's final attack on the sufficiency of the evidence focuses on his CCE conviction. "The CCE offense has five elements: (1) a predicate offense violating a specified drug law (2) as part of a 'continuing series' of drug violations (3) that occurred while the defendant was acting in concert with five or more other people (4) to whom the defendant occupied the position of an organizer or manager and from which series the defendant (5) obtained substantial income or resources." *United States v. Markowski*, 772 F.2d 358, 360–61 (7th Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986); *see* 21 U.S.C. § 848; *Garrett v. United States*, 471 U.S. 773, 781, 105 S.Ct. 2407, 2412, 85 L.Ed.2d 764 (1985). Mr. Holguin raises two contentions: First, he argues that the government failed to prove that he participated in at least three felonies so as to come under the ambit of a "continuing series"; and second, he argues that the government failed to show that he acted in concert with at least five persons in regard to whom he was in a position of organizer, supervisor or manager. We address these two contentions in turn.

### a.

As Mr. Holguin correctly states, and the government agrees, the "continuing series" element of the CCE statute requires that the defendant have committed at least three felony violations of the federal narcotics laws. *United States v. Chiattello*, 804 F.2d 415, 420 (7th Cir.1986); *United States v. Head*, 755 F.2d 1486, 1490 (11th Cir.1985). The government interprets Mr. Holguin's contentions as a repeat of his prior arguments that the evidence was insufficient to sustain his convictions for violating the other federal narcotics laws charged against him in the indictment. Accordingly, the government asserts that, if the evidence was sufficient to convict Mr. Holguin on those other counts, then those predicate acts also serve to convict him on the CCE charge.

The CCE count in the indictment alleged twenty-two specific predicate acts.[11] Each of those acts also was alleged separately as a substantive offense elsewhere in the indictment. The jury found Mr. Holguin guilty of each count. There is no claim made that the counts are multiplicitous. Accordingly, there is no basis for Mr. Holguin's attack of his CCE conviction on this ground.

### b.

Mr. Holguin's second contention relating to his CCE conviction is somewhat more complex. He contends that the government failed to show that he supervised, managed, or organized at least five people in regard to the conspiracy. In contrast, the government contends here, as it did at trial, that there were seven: (1) Mauricio Giraldo; (2) Chavela or "the girl"; (3) Humberto Castrellon; (4) "the compadre"; (5) Donald or Donaldo; (6) Gabriella Torres; and (7) "the kid."

■ As to Mauricio Giraldo, Mr. Holguin claims error because there is no foundation for the admission of Mr. Giraldo's identification,[12] and, in any event, the evidence is insufficient to show that Mr. Giraldo participated in a narcotics conspiracy. Next, he contends that Chavela and "the girl" are the same person. However, the government concedes this. As to "the compadre," Mr. Holguin contends that there is no direct evidence linking himself ,to Mr. Castrellon's "compadre"; he submits that the CCE is not a vicarious liability statute. He

---

11. The jury was permitted to consider only 21; the district court refused to permit the jury to consider the narcotics conspiracy alleged in count 1 as a predicate act.

12. Mr. Holguin contends that the telephone conversations between Mr. Giraldo and Rudy should not have been admitted because the government failed to identify Rudy on any of the transcripts. However, as the government properly contends, Mr. Holguin stipulated that the speakers, except for himself, were correctly identified on the transcripts. There is no evidence to indicate that this stipulation excluded either Rudy or Mr. Giraldo.

then contends that Donaldo appears only in one telephone conversation in which he leaves a message for Mr. Castrellon to call him or Mr. Holguin. He submits that there is no evidence linking Donaldo to any conspiracy. Finally, as to "the kid," Mr. Holguin contends that the only reference to him appears "in regards to an unknown person who performed an unknown act at an unknown time for unknown purposes." Holguin's Br. at 95–96.

Our review of the record concerning Mauricio Giraldo reveals that there was evidence indicating that he came to Chicago from Miami, on behalf of Mr. Holguin, to collect payment for cocaine that Mr. Holguin supplied to Rudy.

As to Chavela, the government agrees that Chavela and "the girl" are the same person. To establish that Mr. Holguin supervised Chavela's actions in the conspiracy, the government presented evidence that, when Mr. Castrellon complained to Mr. Holguin that the cocaine he had given him was of poor quality, Mr. Holguin said that he would direct Chavela to sell some of this cocaine for Mr. Castrellon.

As to Mr. Castrellon, the evidence established that Mr. Castrellon delivered cocaine for Mr. Holguin. For example, Mr. Castrellon was seen at Rudy's Service Station in 1985. This was only two days after a conversation between Mr. Holguin and Rudy in which Mr. Holguin informed Rudy that Mr. Castrellon would soon deliver him a "box" of "filters," apparently from Miami. Tr. vol. 13 at 2315–19; Appellee's Ex. Whipple 5. After Mr. Castrellon's arrival at the gas station, Rudy told his associates that the delivery had been made. The record also discloses that Mr. Holguin organized Mr. Castrellon's efforts to "dump" poor quality cocaine.

As to "the compadre," the record discloses that he assisted Mr. Castrellon in disposing of the cocaine. An individual need not have direct communications with individuals in order to be their supervisor. As the Eleventh Circuit recently held, "if a defendant personally hires only the foreman, that defendant is still responsible for organizing the individuals hired by the foreman to work as the crew. We find that mere delegation of authority does not detract from [the defendant's] ultimate status as organizer." *United States v. Rosenthal,* 793 F.2d 1214, 1226 (11th Cir.), *modified on other grounds,* 801 F.2d 378 (11th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

Concerning Donaldo, the government introduced evidence that he had left messages at Rudy's Service Station stating that "we need him [Mr. Castrellon] urgently" and that he should call either Donaldo or Mr. Holguin. Tr. vol. 23 at 4078–80; Appellee's Exs. Rudy 87–88. Donaldo identified himself as being from "the travel agency in Miami." Tr. vol. 23 at 4078. Mr. Holguin's Miami business was a travel agency called Latin American Tours. Appellee's Br. at 69 n. 65. Donaldo also is mentioned in a conversation between Mr. Holguin and Mr. Castrellon in which Mr. Castrellon, after being asked by Mr. Holguin if he wanted to do business, responded, "I will call you back later ... at Donaldo's or on the beeper." Tr. vol. 23 at 4178; Appellee's Ex. Rudy 97.

The government's attempt to connect Gabriella Torres to Mr. Holguin is, in our view, unsatisfactory. There is no doubt that Ms. Torres' drug-related activities were under the supervision and control of Mr. Castrellon. However, although some of Mr. Castrellon's activities either were directed or organized by Mr. Holguin, it is quite clear, by the government's own admission,[13] that not all of his activities were under Mr. Holguin.[14] The two telephone

---

13. At closing argument, counsel for the government noted:

> So Humberto Castrellon supervises five or more people in his own way. He is a big drug dealer in his own right, but on specific discrete transactions, Gustavo Holguin is supervising him.

Tr. vol. 36 at 6571.

14. Earlier, during the instruction conference, counsel for the government pointed out to the district court:

> THE COURT: He is saying, at least in that transaction when it is the bad dope, that, I suppose, in an organizational chart you would put them almost on the same hierarchical plane.

conversations referenced by the government in an attempt to link Ms. Torres to the Holguin–Castrellon undertaking contain no indication that Ms. Torres' assistance of Mr. Castrellon was in any way related to Mr. Castrellon's activities with Mr. Holguin. The government has failed to submit any other evidence on this matter. Under these circumstances, a rational jury could not have concluded that Mr. Holguin organized, supervised, or in any other way managed the activities of Ms. Torres.

■ We emphasize that, in reaching this conclusion, we do not mean to imply that the subordinate of an intermediary can never be considered, for purposes of the CCE statute, as managed by someone further up in the organization. Indeed, the contrary proposition is well established. *See Rosenthal,* 793 F.2d at 1226; *see also United States v. Phillips,* 664 F.2d 971, 1034 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Bolts,* 558 F.2d 316, 320 (5th Cir.), *cert. denied,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). However, in a situation such as this one, where the government cannot rely on circumstantial evidence of organizational hierarchy and structure, other evidence of the relationship between the controller and the controlled must be present. Here, it is missing.

The government also relied explicitly on a seventh actor who was supposedly under the control of Mr. Holguin. This actor appears only once in the transcript in a cryptic reference by Mr. Castrellon that "he" (supposedly Mr. Holguin) "was going to send the kid ... for what [Rudy] ... w[as] missing." Tr. vol. 20 at 3497. There is no indication that "the kid" is anyone other than one of the persons mentioned in the earlier paragraphs. While it hardly will be possible for the government to identify each actor by name, it is necessary that, in such a circumstance, sufficient other evidence be introduced to establish a separate and distinct identity.

■ The foregoing analysis requires that we reverse Mr. Holguin's conviction under the CCE statute. It certainly is not necessary for the government to establish in every CCE case the specific identity of all five individuals subject to the defendant's direction. Oftentimes, the government will be able to establish that an individual's place in the hierarchy or structure of the organization establishes his direction of five or more people. *See Markowski,* 772 F.2d at 360.[15] However, when the government, as here, does not rely on such an approach and instead chooses to rely on the activity of specific individuals, it must submit sufficient evidence to permit a rational jury to conclude that each of those individuals had been directed by the defendant. Here, the government admits explicitly that it argued at trial that Mr. Holguin managed or supervised these seven people. Appellee's Br. at 77 n. 73. Because the jury was not asked to specify the persons it found controlled by Mr. Holguin,[16] the possibility exists that the jury could have relied on the presence of either

---

MR. ELDEN: That is right. Tr. vol. 33 at 5953.

**15.** In *Markowski,* as in *United States v. Tarvers,* 833 F.2d 1068 (1st Cir.1987), there was no claim that the evidence linking any of the individuals allegedly organized by the defendant was legally insufficient to support a jury verdict.

**16.** In order to preserve the point on appeal, several cases in the Second Circuit require that the defendant challenge the legal sufficiency of the evidence by motion for judgment of acquittal or its equivalent before the case goes to the jury. *See, e.g., United States v. Wilkinson,* 754 F.2d 1427, 1432 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Young,* 745 F.2d 733, 755 (2d Cir.1984), *cert. denied* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Natelli,* 527 F.2d 311, 329 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). Such a practice puts the court and the government on notice of the challenge and permits the government to request a special verdict designating the individuals who it finds were directed by the defendant. We have no occasion to determine definitively the appropriateness of such a rule. Here, Mr. Holguin moved for judgment of acquittal. Thus, the government was alerted to the nature of Mr. Holguin's contention and had the opportunity to request a special verdict.

Ms. Torres or the kid.[17] *See Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957); *United States v. Holzer*, 840 F.2d 1343, 1352 (7th Cir. 1988). Although we uphold Mr. Holguin's other convictions, our precedent requires that he be resentenced because "the judge conceivably may have given him a longer sentence because he erroneously believed that ... [Mr. Holguin] had committed another crime...." *Id.*[18]

### B. *Gabriel Alvarez*

Mr. Alvarez raises three avenues of attack on the sufficiency of the government's evidence: First, he contends, the government's proof at trial established two separate RICO "conspiracies" rather than one single RICO "conspiracy"; second, he submits that the government failed to show any nexus between his conspiratorial conduct and interstate commerce; and third, he asserts that he was not part of the count one conspiracy to distribute narcotics.

### 1. The Existence of a Single RICO Enterprise

■ With respect to his first contention, Mr. Alvarez submits that the agreement between himself and Juventino, concerning heroin, was a separate and distinct RICO "conspiracy" from the agreement between the other codefendants to sell narcotics. He submits that there was no evidence that he was employed by, or associated with, the larger "conspiracy" proved by the government. In contrast, the government contends that the evidence at trial was sufficient to show a single RICO "enterprise." Specifically, it contends, the association of Juventino and Mr. Alvarez for the sale of heroin was not independent of the association of the other defendants for the sale of narcotics.

At the outset, it is important to note that the government charged—and the jury convicted—Mr. Alvarez of a substantive RICO offense or "enterprise" under 18 U.S.C. § 1962(c).[19] Mr. Alvarez was not convicted, as his brief suggests, of a RICO "conspiracy," which is a violation of 18 U.S.C. § 1962(d). To establish a RICO enterprise violation, the government must prove:

(1) the existence of an enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that he participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that he participated through a pattern of racketeering activity, i.e. through the commission of at least two racketeering acts.

*United States v. Kopituk*, 690 F.2d 1289, 1323 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *see also United States v. Horak*, 833 F.2d 1235, 1239–40 (7th Cir.1987); *United States v. Blackwood*, 768 F.2d 131, 137 (7th Cir.) *cert. denied*, 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985).

In essence, Mr. Alvarez argues that the evidence of record does not establish that his actions can be construed to show that he was employed by or associated with the single enterprise proved by the government. In this context, an enterprise is

17. Indeed, there is evidence that the jury was not convinced that all seven participated. During its deliberations, it passed the following inquiry to the court:

A few of the misinterpretations are with first, the CCE charge[,] do we have to agree on the same five people? When it says organize supervise or manage mean [sic] all the time? Can it mean only on one occasion? It seems that we're unclear on these questions[.] Can you help clear up this matter?

R. 357 (letter filed at 11:55 a.m. on July 23, 1986).

18. Mr. Holguin raises several issues related to the propriety of his sentencing hearing. However, because we remand for resentencing in light of the reversed CCE conviction, we need not address these issues at this juncture.

19. Section 1962(c) of title 18 of the United States Code provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

defined as including "any individual, partnership, corporation, association, or other legal entity...." 18 U.S.C. § 1961(4). The Supreme Court has given us further guidance by noting that an enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). As a result, we must determine whether the government presented enough evidence for a reasonable jury to find that a single RICO enterprise existed for the purpose of selling narcotics—cocaine, heroin, and marijuana—and that Mr. Alvarez participated in the affairs of that enterprise. In our view, there is sufficient evidence of record to support a jury determination that the transactions in which Mr. Alvarez participated were part of the activities of the RICO enterprise alleged by the government.

### a. transactions with Agent Lopez

Our review of the record indicates that Agent Lopez made at least four undercover purchases of heroin—two from Mr. Alvarez accompanied by Juventino and two from Juventino alone. At trial, the government introduced evidence establishing Rudy as the source of the heroin in all of these transactions. For instance, when Agent Lopez purchased twenty ounces of heroin for $15,000 from Juventino at Rudy's Service Station on June 27, 1985, Juventino told Agent Lopez that the source of Juventino's *cocaine* on past occasions, as well as the *heroin* he was now buying, "was the same person." Tr. vol. 5 at 1040. The government contends that the source of the cocaine was Rudy, an argument overwhelmingly supported by the evidence and not contested by the appellants. Also, DEA Agent Norbert Kuksta testified that he witnessed Juventino give Rudy a black box, the same type of container holding the $15,000 that Agent Lopez gave to Juventino, shortly after the June 27, 1985 heroin transaction. In addition, Agent Lopez testified that Juventino told him that the source of his *previous* heroin purchases was the same person that supplied the June 27, 1985 heroin. The only two heroin transactions involving Agent Lopez prior to the June 27, 1985 sale were two transactions at which both Mr. Alvarez and Juventino were present. Furthermore, Agents Kuksta and Ludvigsen testified that Rudy and Juventino transported a plastic bag to the June 27, 1985 sale, which subsequently was shown to contain heroin. Finally, a portion of the money used in this heroin transaction ultimately was uncovered in a search of Rudy's residence.

On the other hand, we do note that, when Mr. Alvarez sold heroin to Agent Lopez for the *first* time, Juventino told Agent Lopez that the source of the cocaine was Rudy and the source of the heroin was Mr. Alvarez. However, at most, this presents conflicting evidence and, as we already have noted, under our standard of review, we must view such evidence in the light most favorable to the government. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Garner*, 837 F.2d at 1422.

### b. association with activities of the enterprise

The government also introduced evidence that the defendant Juan Rivera (not an appellant), served as a lookout for Mr. Alvarez and Juventino during Agent Lopez' purchase of heroin on April 30, 1985. Mr. Rivera was charged as a participant in the conspiracy but eluded trial. Nevertheless, the government produced evidence which tended to show that Mr. Rivera had, on at least one occasion, negotiated the purchase of marijuana from Rudy.

Finally, the government introduced evidence that Mr. Alvarez was concerned with "why [Agent Lopez] wasn't buying any coke," tr. vol. 4 at 768, when Agent Lopez had arranged to buy heroin from Mr. Alvarez on May 29, 1985. The government suggests that Mr. Alvarez' inquiry evidences an interest on his part in the cocaine business as well as in the heroin trade. This contention is bolstered by the testimony of Customs Service Agent Theodore Siggins, who testified that, on June 29, 1985, he witnessed Mr. Alvarez and another man

arrive together at Rudy's Service Station. At the gas station, according to Agent Siggins, both men conversed with Rudy, Mr. Castrellon, and several other individuals. After approximately one hour, Agent Siggins observed Mr. Alvarez depart with Rudy and another man in a pickup truck. The three men subsequently returned to the gas station. Approximately thirty minutes later, appellant Leovigilda Rivera arrived at the station and conversed with Mr. Alvarez, Rudy, Mr. Castrellon, and others before Mr. Alvarez finally departed.

Viewing all of this evidence in its entirety, we hold that the government presented sufficient evidence to establish, albeit circumstantially, that only one criminal RICO enterprise existed which included Mr. Alvarez as a participant.

### 2. Interstate Commerce Nexus

Nevertheless, Mr. Alvarez contends that, even though he was part of a RICO "conspiracy" to sell heroin with Juventino, the government failed to prove beyond a reasonable doubt that the heroin he sold affected interstate commerce. Mr. Alvarez makes this argument only as to the smaller "conspiracy" to which he concedes his participation. As he states in his brief, the evidence, when "viewed in the light most favorable to the prosecution reveals that ... he participated in two heroin sales wherein he and Juventino sold the substance to Raleigh Lopez on April 30, 1985 and May 29, 1985." Alvarez' Br. at 8. The government introduced evidence that the heroin Mr. Alvarez and Juventino sold to Agent Lopez was brown. Brown heroin comes from Mexico. Tr. vol. 2 at 154 (testimony of Agent Lopez).

In the context of a RICO enterprise, the government carries its burden of establishing an "affect [on] interstate or foreign commerce," 18 U.S.C. § 1962(c), even if it shows only a minor or minimal influence on interstate commerce. *United States v. Robinson,* 763 F.2d 778, 781 (6th Cir.1985);

*Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1289 (7th Cir. 1983); *United States v. Nerone,* 563 F.2d 836, 854 (7th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978). Accordingly, Agent Lopez' testimony satisfies the government's minimal burden.

### 3. The Conspiracy Count

Finally, Mr. Alvarez contends that there was a material variance between the single 21 U.S.C. § 846 conspiracy alleged in count 1 of the indictment,[20] and the two separate and distinct narcotics "conspiracies" that he alleges the government established at trial. He submits that this material variance caused substantial prejudice to him because of transference of guilt and evidentiary spillover. The government submits that Mr. Alvarez never raised the issue below, nor did he ask for a multiple conspiracy instruction to the jury. Accordingly, the government urges us to find that this argument has been waived.

#### a.

We agree with the government that Mr. Alvarez has waived this argument. Rule 30 of the Federal Rules of Criminal Procedure clearly states that "[n]o party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Fed.R. Crim.P. 30. Compliance with the strictures of Rule 30 is "a requirement taken seriously in this circuit." *United States v. Kerley,* 838 F.2d 932, 936 (7th Cir.1988); *see United States v. Kehm,* 799 F.2d 354, 362–63 (7th Cir.1986); *United States v. Kueckier,* 740 F.2d 496, 503 (7th Cir.1984). Here, Mr. Alvarez never tendered an instruction on material variance of multiple conspiracies. Although he arguably raised the is-

---

**20.** Section 846 of title 21 of the United States Code provides:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846.

sue in a post-trial motion for judgment of acquittal, that motion came too late to avoid waiver. *See Kerley,* 838 F.2d at 936; *Kehm,* 799 F.2d at 362–63.

■ Nor do we believe the plain error doctrine affords Mr. Alvarez relief. Even if we agreed with him that two distinct conspiracies existed, the evidence demonstrates that he was involved with both. *See United States v. Noble,* 754 F.2d 1324, 1330 (7th Cir.) (generally, there can be no prejudice if defendant participated in both of two distinct conspiracies proved at trial), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985).

### The Speedy Trial Act

### 1. Contentions of the Parties

Mr. Holguin raises two issues concerning his right to a speedy trial. First, he contends that the government violated the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.,* by failing to commence his trial within seventy days from the date on which he first appeared before a judicial officer. Second, he perfunctorily argues that this delay deprived him of his right to a speedy trial under the sixth amendment.

The government responds that both of these arguments are waived because they were not raised before the district court. Concerning the statutory right to a speedy trial, the government submits that Mr. Holguin never demanded a speedy trial. Even if he had, however, the government submits that merely demanding a speedy trial is insufficient to reverse a conviction on that ground alone. As to the sixth amendment right to a speedy trial, the government asserts that Mr. Holguin's brief inadequately raises the issue, as it only mentions the sixth amendment right in the first and last paragraphs of Mr. Holguin's argument relating to the speedy trial statutory claim.

### 2. Analysis

### a. statutory right to a speedy trial

■ Section 3161(c)(1) of title 18 of the United States Code provides in relevant part:

> In any case in which a plea of not guilty is entered, the trial of the defendant charged in the information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1). Mr. Holguin contends that he first appeared before a judicial officer on November 2, 1985 and remained in custody until commencement of his trial on May 16, 1986—a period of 195 days. However, section 3162 explicitly states that "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section." 18 U.S.C. § 3162(a)(2).

Courts have applied strictly this waiver language where a defendant has failed to move for dismissal prior to the commencement of trial. *See, e.g., United States v. Ballard,* 779 F.2d 287, 294 (5th Cir.), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. Tenorio–Angel,* 756 F.2d 1505, 1508 (11th Cir. 1985); *United States v. Daly,* 716 F.2d 1499, 1506 (9th Cir.1983), *cert. denied,* 465 U.S. 1075, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *United States v. Little,* 567 F.2d 346, 349 (8th Cir.1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1608, 56 L.Ed.2d 60 (1978); *see also United States v. Andrews,* 790 F.2d 803, 810 (10th Cir.1986) (applying waiver where defendant pleaded guilty), *cert. denied,* 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 505 (1987). Mr. Holguin contends that three times prior to trial, on December 2, 19, and 23, 1985, he made an express demand for trial before the district court.[21] He cites no portion of the record,

---

**21.** Specifically, Mr. Holguin contends on appeal that "[o]n December 2, 1985, Defendant was arraigned and *demanded trial.* On December 19, 1985, Defendant has [sic] a status hearing and *demanded trial.* On December 23, 1985, Defendant has [sic] a status hearing and *demand trial* [sic]. In short, Defendant *demand trial* [sic] every time he was before the Trial

however, to support this contention. Nor has he included the transcripts of the district court proceedings on those dates either in his appellate brief or in the record. We therefore find no basis "for granting relief from the waiver." *United States v. Whaley*, 830 F.2d 1469, 1475 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

Nevertheless, even if Mr. Holguin had demanded trial, he did not move for dismissal. A case directly on point is *United States v. Stitzer*, 785 F.2d 1506 (11th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986). There the court noted that, although no motion for *dismissal* of the indictment was made, the defendant "did file a speedy trial *demand....*" *Id.* at 1520. (emphasis supplied). After quoting the section 3162(a)(2) burden on the defendant to move for *dismissal*, the court concluded:

> We do not believe that appellant's demand for a speedy trial constitutes a motion to dismiss the indictment, for it did not bring to the trial court's attention the fact that appellant believed the Act had been violated. In effect, appellant sat on his hands below, allowed this lengthy case to be tried fully, and raises now for the first time the claim that the indictment should have been dismissed. Rather than allow appellant's "wait and see" tactic to prevail, we find that he has waived this objection.

*Id.; see Tenorio–Angel*, 756 F.2d at 1508 n. 5. Accordingly, Mr. Holguin's argument lacks merit.

### b. sixth amendment claim

■ Mr. Holguin states his sixth amendment speedy trial argument as follows:

> Holguin first appeared before a judicial officer on November 2, 1985 and remained in custody until his trial began [on] May 16, 1986—195 days after his first appearance and in violation of his right to speedy trial under the Sixth Amendment and *18 U.S.C. 3161. ...* Defendant's right to speedy trial under

Court...." Holguin's Br. at 102 (emphasis sup-

18 U.S.C. 3161 and the Speedy Trial Clause of the *Sixth Amendment to the United States Constitution* were denied. Holguin's Br. at 101–02 (emphasis in original).

Mr. Holguin cannot prevail. As the Supreme Court has noted: "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.... [T]he delay that can be tolerated for an ordinary street crime *is considerably less than for a serious, complex conspiracy charge.*" *Barker v. Wingo*, 407 U.S. 514, 530–31, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972) (emphasis supplied). In *United States v. Diaz–Alvarado*, 587 F.2d 1002 (9th Cir.1978), *cert. denied*, 440 U.S. 927, 99 S.Ct. 1261, 59 L.Ed.2d 482 (1979), the Ninth Circuit held that a 152–day delay in bringing a narcotics conspiracy to trial was "insufficient to show [a] violation of the right" where the "appellant[ ] fail[ed] to show any prejudice resulting from the delay." *Id.* at 1005. Indeed, without even considering time properly excluded under 18 U.S.C. § 3161(h), we fail to see how Mr. Holguin raises an argument that the delay here was prejudicial. Therefore, his claim must fail.

### Special Parole

Mr. Alvarez raises the contention that his special parole sentence for life on count 12 of the indictment should be vacated because the statute authorizing such sentence is unconstitutional. On February 13, 1987, however, he filed a motion with the district court to vacate the special parole term. The court granted the motion and vacated the sentence in a docket entry dated March 27, 1987. Accordingly, the issue is moot.

### Improper Joinder and Fed.R.Evid. 404(b)

This issue is presented to us in a rather complex procedural posture. We begin with the essential facts. The question centers on a July 9, 1984 narcotics transaction between Mr. Castrellon and two undercov-

plied).

er government authorities—Rafael Tovar, a Des Plaines, Illinois police officer and Scott Ando, a DEA agent. The officers testified that they attempted to purchase, and then seized, approximately two kilograms of cocaine from Mr. Castrellon and two of his associates. One of the associates, Sebastiano Ganci, was linked to further narcotics business involving Mr. Castrellon through the summer of 1985.

Prior to trial, Mr. Castrellon, joined by the other defendants, made a motion pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure to sever ¶ 17 of count one of the complaint (alleging the July 9, 1984 transaction as part of a narcotics conspiracy between all of the defendants commenced in July 1984); count two (alleging the participation of all of the appellants in a RICO enterprise commenced in July 1984); and count four (alleging Mr. Castrellon's participation in a CCE, including the July 9, 1984 event as a predicate act). In essence, the defendants requested that conduct relating to the July 9, 1984 episode with Officer Tovar and Agent Ando not be tried at the same time as the other allegations.

The district court granted the motion *in limine* subject to reconsideration at the conclusion of the government's case. This ruling had the practical effect of requiring the government to present the rest of its case first. At the conclusion of the government's presentation, the district court made three rulings: First, that the evidence of the July 1984 transaction was not properly included in the narcotics conspiracy or the RICO counts of the indictment; second, that the transaction was admissible as proof of a predicate act under the CCE count against Mr. Castrellon only; and third, that the transaction was admissible against Mr. Castrellon on all counts, not as proof of guilt, but as proof of intent, preparation and knowledge under Rule 404(b) of the Federal Rules of Evidence.

The parties have presented us with elaborate arguments on the issue of whether these rulings should be analyzed under Rule 8(a), Rule 8(b)[22] or Rule 14.[23] Joinder under Rule 8(a) is permissible where offenses are (1) of the same or similar character, or (2) based on the same act or transaction, or (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Fed.R.Crim.P. 8(a). Rule 8(b) allows charging in the same indictment two or more offenders "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b). We have stressed that "the government may not tack the two subsections together and in one indictment charge different persons with committing offenses of 'similar character.'" *United States v. Velasquez,* 772 F.2d 1348, 1352 (7th Cir. 1985); *see also* 8 J. Moore, *Moore's Federal Practice* § 8.06[1] at 8–25 (2d ed. 1982) ("Rule 8(a) may be applied *only* to offenses joined against a single defendant; when more than one defendant is charged, Rule 8(b) must be applied.") (emphasis in original; footnote omitted). Finally, Rule 14

---

**22.** Rule 8 of the Federal Rules of Criminal Procedure provides:

(a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transac-

tions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8.

**23.** Rule 14 of the Federal Rules of Criminal Procedure provides in relevant part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.

permits severance if it appears that the defendant or the government is prejudiced by the joinder of the defendants or offenses. "[O]nce the Rule 8 requirements [are] met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14...." *United States v. Lane,* 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986).

Here, the district court, confronted with the pragmatics of conducting a complex criminal trial, understandably focused more on substance rather than form. Its key concern was the one stressed in *Velasquez*—prejudice from tacking the two subsections of Rule 8 together and thereby permitting trial of different persons for offenses that are unrelated, although similar in character.

■ We believe that, given the procedural posture of the case, it is most appropriate to analyze the district court's action under Rule 8(b). In addition to alleging sufficient evidence to support joinder, under Rule 8(b), the indictment also must allege that the defendants participated in "the same series of acts or transactions." Fed.R.Crim.P. 8(b). Count four (CCE) alleged sixty-two predicate acts [24] that were charged as crimes in other portions of the indictment against Mr. Castrellon and other defendants involved in the narcotics conspiracy. Only one of the transactions alleged in count four related to the July 9, 1984 undercover cocaine purchase from Mr. Castrellon. And the government introduced evidence that Mr. Castrellon already was involved with Rudy at that time. The government presented at least three pieces of evidence that linked Mr. Castrellon to Rudy dating as far back as July 1984, and possibly earlier. First, the government seized a private pocket telephone book, which belonged to one of Mr. Castrellon's associates, in July 1984. The book lists the name Humberto Castrellon with the phone number of Rudy's Service Station. Second, also in July 1984, police discovered ledgers in Mr. Castrellon's automobile making references to associates of "Popo." Agent Kuksta testified that "Popo" was a nickname used by Rudy. Third, the government introduced a parking ticket dated March 11, 1984, which was issued to an automobile registered to Mr. Castrellon. The location of the automobile was in close proximity to Rudy's Service Station.

Hence, it was well within the discretion of the district court to conclude that the CCE count "arose out of the same overall scheme" of narcotics violations that were alleged throughout the indictment. *See United States v. Holzer,* 840 F.2d 1343, 1350 (7th Cir.1988). This result is especially compelling where, as here, the different counts alleged in the indictment, including count four, required a "commonality of proof." *See United States v. Isaacs,* 493 F.2d 1124, 1159 (7th Cir.) (per curiam), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. Daddano,* 432 F.2d 1119, 1125–26 (7th Cir. 1970), *cert. denied,* 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971); *United States v. Roselli,* 432 F.2d 879, 899 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

A CCE charge, which, by its nature, brings within its ambit a broad range of criminal activity, presents special problems under Rule 8(b). The district court's midtrial ruling prohibiting the use of the July 9, 1984 incident against any of the other defendants was, we believe, a pragmatic and, under the circumstances presented here, effective resolution of these competing concerns. The ruling protected adequately the other defendants.

Mr. Castrellon's rights also were protected by the district court's ruling with respect to Rule 404(b).[25] We previously have

---

**24.** The jury was permitted to consider only 61; the district court refused to permit the jury to consider the narcotics conspiracy alleged in count 1 as a predicate act.

**25.** Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

held that evidence of other acts is admissible under Rule 404(b) if:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ..., (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Davis,* 838 F.2d 909, 914 (7th Cir.1988) (quoting *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir. 1984) (citations omitted)); *see United States v. Taggatz,* 831 F.2d 1355, 1358 (7th Cir.1987); *United States v. Tuchow,* 768 F.2d 855, 862 (7th Cir.1985); *United States v. Chaimson,* 760 F.2d 798, 804 (7th Cir. 1985). The decision of the district court will not be reversed unless there was a clear abuse of discretion. *Taggatz,* 831 F.2d at 1358; *see Davis,* 838 F.2d at 914; *United States v. Harris,* 761 F.2d 394, 398 (7th Cir.1985).

■ Here, the district court noted that many of the recorded conversations challenged by the appellants were cryptic and oblique. Because the court believed it was important for the jury to understand the "true ... meaning of the word[s] and the knowledge and intent with which they were spoken by Mr. Castrellon and the recorded speakers," the court admitted the evidence. Tr. vol. 25 at 4513. The court also determined that the evidence "is highly probative on those matters that the defendant Castrellon was, if the government's evidence is accepted as true, engaged in a substantial cocaine transaction shortly prior to the events of this conspiracy...." *Id.* at 4513–14. The district court then concluded:

> This evidence goes to establish a matter in issue other than the defendant's propensity to commit the crime charged. It gives gloss to the meaning of the spoken

edge, identity, or absence of mistake or accident.

words and the intent with which they were spoken.

> The act is both similar to charged acts and close enough in time to be relevant. The evidence is clear and convincing and its probative value is not substantially outweighed by unfair prejudice. It goes to an element in this case.

*Id.* at 4514.

The district court's ruling evidences careful consideration of the relevant factors prior to admitting the evidence. On appeal, there is no showing that the court abused its discretion; the factors articulated by *Davis* and *Shackleford* were satisfied. First, the nature of the July 9, 1984 transaction illuminates the cryptic language subsequently used by the coconspirators to mask their true meaning. Second, the July 9, 1984 transaction was " 'sufficiently alike [to other narcotics transactions alleged in the indictment] to support an inference of criminal intent.' " *United States v. Radseck,* 718 F.2d 233, 236 (7th Cir.1983) (quoting *United States v. O'Brien,* 618 F.2d 1234, 1238 (7th Cir.), *cert. denied,* 449 U.S. 858, 101 S.Ct. 157, 66 L.Ed.2d 73 (1980)), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984). Third, the evidence of the July 9, 1984 cocaine transaction was both clear and convincing. And fourth, the evidence was highly probative and not substantially outweighed by unfair prejudice to Mr. Castrellon. Indeed, the district court twice explicitly noted that it found the probative value of the evidence outweighed any prejudicial effect. Moreover, Mr. Castrellon himself does not contest that Rule 404(b) properly was applied to testimony by Sebastiano Ganci, a convicted felon and, as already discussed, one of Mr. Castrellon's associates in the July 9, 1984 transaction. Castrellon's Br. at 20. Apparently, Mr. Castrellon is troubled by the admission of testimony from the more credible government authorities (Officer Tovar and Agent Ando). Such a concern, however, is an insufficient basis on which to establish unfair prejudice.

Fed.R.Evid. 404(b).

As to the other appellants, in admitting the evidence under Rule 404(b), the district court explicitly ruled that "I am, nevertheless, going to limit the evidence as to Castrellon and instruct the jury accordingly." Tr. vol. 25 at 4515. The court subsequently did so. Neither Mr. Alvarez nor Ms. Rivera make any showing whatsoever that the introduction of this one July 9, 1984 transaction—properly limited to only Mr. Castrellon—created any reversible error of evidentiary spillover.

### Cross–Examination of Character Witnesses

#### A. Background

Oneyda Zambrana contends that the cross-examination of her two character witnesses, Secorro Reyes and Evangeeilana Sanz, exceeded the scope of direct examination and prejudiced the jury sufficiently to warrant a new trial. Specifically, she contends that the government cross-examined the two witnesses about whether they knew or had heard:

1) That Oneyda Zambrana came to the United States from Honduras before March, 1973, paid a man by the name of Van Mumford $500 in March of 1973 to enter into a bogus marriage in order to become a legal resident and applied to the I.N.S. for legal resident status based upon that sham marriage;

2) That Oneyda Zambrana reentered the United States as a visitor on a tourist visa in 1976 or 1977, remained as an illegal alien after expiration of her visa, and had been an illegal alien since then;

3) That in 1978, Oneyda Zambrana obtained a "form of divorce" from Van Mumford and married Etien Zambrana in 1980;

4) That after their marriage, Etien Zambrana dealt in cocaine and Oneyda Zambrana knew that he was doing so;

5) That Etien Zambrana was convicted of drug trafficking in the state court of Florida, and that in 1983, Oneyda Zambrana helped her husband escape from prison after he had been convicted.

Zambrana's Br. at 11.

In contrast, the government contends that the cross-examination related directly to Mrs. Zambrana's character traits at issue, i.e. peacefulness and law abidance. It also contends that there was a good faith basis for asking the challenged questions.

#### B. Standard of Review

The standard of review of a district court's decision on the allowable scope of cross-examination of a character witness is clear abuse of discretion. *Michelson v. United States*, 335 U.S. 469, 480, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948); *United States v. Baskes*, 649 F.2d 471, 477 (7th Cir.1980), *cert. denied*, 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). The government must show, however, that it had a good faith factual basis for inquiry into the past acts of misconduct. *See Michelson*, 335 U.S. at 472, 481, 69 S.Ct. at 216, 221; *United States v. Williams*, 738 F.2d 172, 176 n. 6 (7th Cir.1984); *United States v. Wells*, 525 F.2d 974, 977 (5th Cir.1976). Moreover, the type of cross-examination challenged here is addressed by Rule 405(a) of the Federal Rules of Evidence which states:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. *On cross-examination, inquiry is allowable into relevant specific instances of conduct.*

Fed.R.Evid. 405(a) (emphasis supplied).

#### C. Specific Issues

On appeal, Mrs. Zambrana raises primarily three arguments with respect to the cross-examination of her two character witnesses.

1.

Mrs. Zambrana first contends that the questions relating to the events occurring in and before 1973 were too far removed in time to be relevant because the witnesses had known her for approximately three years before the trial. The government contends that all of the questions related to continuing violations of the

immigration laws, which include the time that the witnesses knew Mrs. Zambrana.

Character witnesses may be cross-examined about conduct that "may have come to the attention of the relevant community." *United States v. Curtis*, 644 F.2d 263, 268 (3d Cir.1981); *see Michelson*, 335 U.S. at 484, 69 S.Ct. at 222. Although the specific acts that the government explored on cross-examination occurred approximately ten years before the witnesses knew Mrs. Zambrana, the district court noted that—at least with respect to witness Reyes:

> Since this woman ... said she knew [Mrs. Zambrana] after these events, then it's at least conceivable, given that she has both a business and a social acquaintanceship with this lady and a religious one, it is at least possible she might have heard or would know something about Mrs. Zambrana's past and, therefore, there is some basis to ask the question, even though the events happened a long time ago.

Tr. vol. 30 at 5507–08. Concerning Ms. Sanz, the district court noted, over defense counsel's objection, that the government "may inquire into ... whether she's heard certain things since it was reputation evidence that was heard and not opinion evidence." *Id.* at 5535–A.[26]

This case presents a situation similar to that addressed by the Supreme Court in *Michelson*. In *Michelson*, the Court permitted the government to cross-examine defense witnesses about an arrest that occurred 27 years before trial. The Court determined that it was possible that the arrest fell within the ambit of community knowledge. The case also suggests that, when a trial judge takes steps to ensure that there is no prosecutorial abuse, as the district court did here, the judge is accorded wide discretion.[27] We hold therefore that the district court did not abuse its discretion in finding that the community might have heard of Mrs. Zambrana's immigration and marital problems.

### 2.

Mrs. Zambrana's next contention is that the challenged questions related to events occurring outside of the Chicago area, i.e. Miami. According to Mrs. Zambrana, neither her character witnesses nor the Chicago community could have had knowledge of the questioned events. The government contends that it is reasonable to think that either Mrs. Zambrana or others may have spoken about Mrs. Zambrana's prior activities in Miami, such that the events may have come to the attention of the community.

The government's contention is supported by witness Reyes' testimony. At

---

26. The notes of the advisory committee to Rule 405(a) explain that the pre-Rule distinction between asking "do you know," rather than "did you hear," *see Michelson*, 335 U.S. at 482, 69 S.Ct. at 221, of character witnesses is no longer in force. However, there is some argument that the distinction still does exist. As summarized by the Third Circuit, if a character witness' "direct testimony is addressed to community reputation, inquiry [on cross-examination] may be made about conduct, and even about charges, which may have come to the attention of the relevant community. If, on the other hand, opinion evidence is offered in proof of character, relevant cross examination is only that which bears on the fact or factual basis for formulation of the opinion." *United States v. Curtis*, 644 F.2d 263, 268 (3d Cir.1981) (citation omitted). Yet even under this post-Rule distinction, whose validity we need not assess, the government properly asked "did you know or had you heard" because Ms. Reyes testified on direct based upon personal knowledge *and* Mrs. Zambrana's reputation in the community.

27. The Supreme Court in *Michelson* noted that:

> Wide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse. The trial judge was scrupulous to so guard it in the case before us. He took pains to ascertain, out of presence of the jury, that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation. He satisfied himself that counsel was not merely taking a random shot at a reputation imprudently exposed or asking a groundless question to wait an unwarranted innuendo into the jury box.

*Michelson v. United States*, 335 U.S. 469, 482–83, 69 S.Ct. 213, 221–22, 93 L.Ed. 168 (1948). Similarly, the district court in this case examined the government's counsel, outside the presence of the jury, to determine the factual basis of the line of inquiry. The court also gave very explicit cautionary instructions to the jury to prevent prejudice against Mrs. Zambrana.

trial, Ms. Reyes testified that Mrs. Zambrana had said she was married, that her husband was in Miami, that he was in prison at one time, and that she wanted to go back to Miami. This line of questioning had an even stronger foundation than did the previous subissue because Ms. Reyes gained the knowledge from Mrs. Zambrana herself. Accordingly, we cannot say that the district court abused its discretion in permitting this line of inquiry.

### 3.

■ Mrs. Zambrana's final contention is that the government had no good faith basis to ask the questions concerning her aiding the escape of her husband from prison. In her reply brief, she also contends that the questioning gave the jury an erroneous and prejudicial impression that she took an active role in the prison break. The government simply submits that the arguments are without merit.

As we already have noted, the government must have some good-faith factual basis for inquiring about past incidents. *See Michelson*, 335 U.S. at 472, 481, 69 S.Ct. at 216, 221; *Williams*, 738 F.2d at 176 n. 6; *Wells*, 525 F.2d at 977. Here, prior to permitting the question, the district court—out of the presence of the jury—asked the government for the factual basis of this line of questioning. The government responded that Mrs. Zambrana had confessed to an FBI agent that she provided her husband with money to facilitate his escape from prison. She turned him in, however, because he left her for another woman. The government obtained an affidavit from the agent to that effect and presented it to the district court after trial.

■ Concerning the argument that such an inquiry was prejudicial and irrelevant, the district court noted:

Merely being married to a drug dealer is not enough to ask to go into her own character. A lot of people are married to those kinds of people. That's not necessarily a reflection on their character. *But if that is coupled with her involvement in some aspect of that such as*

*trying to get him out of jail, that's a different story. He can ask about that.* Tr. vol. 30 at 5512. We agree with the district court that the testimony was relevant; we see no clear abuse of discretion in its decision to admit the evidence.

### 4.

■ Even if error was committed on any of the foregoing subissues, however, we are convinced that it was harmless. First, the district court gave a strong limiting instruction to the jury:

In connection with the character evidence presented by the defendant Oneyda Zambrana, I permitted questions about a marriage in 1973, about her status as a resident in this country for a period of time and about certain instances related to her husband. *This was permitted only to test the standards of the character evidence that certain witnesses presented.* There is not any proof in the case that could be produced before you legally, within the rules of evidence, of any of these alleged events, and *you should not hold any of these events against Oneyda Zambrana nor should you assume that they are* true.

Tr. vol. 36 at 6615–16 (emphasis supplied). And second, the government presented (1) videotape evidence that Mrs. Zambrana frequently visited Rudy's Service Station; and (2) telephone recordings which evidenced that Mrs. Zambrana ordered cocaine from Rudy for distribution on several occasions. As in our decision in *Williams*, 738 F.2d at 172, "[t]his case did not come down to a swearing contest between appellant and a key prosecution witness which could be resolved only by assessing relative credibility, but rather presented a choice between the government's theory primarily based on objective evidence and appellant's theory supported solely by the testimony of his co-defendant, whose credibility the jury was free to assess." *Id.* at 177 (citation omitted). A similar result is compelled here.

### *Admission of the Pistol*

### 1.

Pursuant to a valid warrant, police searched the residence of Leovigilda Rivera

on South Whipple Street—the object of the federal agents' extended surveillance. The search uncovered a triple beam scale, an amount of cocaine and an unloaded .22 caliber semi-automatic pistol. Ms. Rivera filed a motion *in limine* to exclude the gun as evidence. The district court denied the motion and the pistol was admitted into evidence. Ms. Rivera, joined by Mr. Alvarez (who adopts her arguments), now contends that the admission of the pistol as evidence was irrelevant to the crimes with which she was charged. In the alternative, she contends that the admission of the pistol into evidence constituted reversible error because its prejudice substantially outweighed its probative value. The government contends that the pistol properly was admitted as a "tool of the trade." In the event that we decline to adopt that rule, the government submits that the gun was admissible as evidence of Ms. Rivera's knowledge (that cocaine was being stored in her home) and intent (to protect it).

2.

As already noted, district courts have broad discretion on evidentiary matters. This also is true concerning the court's determination of the relevancy of proffered evidence. *United States v. Covelli,* 738 F.2d 847, 854 (7th Cir.), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984); *United States v. West,* 670 F.2d 675, 682 (7th Cir.), *cert. denied,*

457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). Here, the district court based its denial of the motion *in limine* on two grounds:

> First of all, it is consistent with the cases that say that a gun is a tool of the trade of the drug business. Number two, it does suggest, as the government argues in its papers, that something valuable was being kept on the premises. It does go to the question of knowledge and intent of what was kept on the premises and the importance of that material, their value and the fact that, if you will, it is not only an illegal business, but a risky business.

Tr. vol. 22 at 3854. Although this circuit has not addressed the "tool of the trade" rationale for the admissibility of weapons in narcotics cases,[28] the overwhelming majority of courts of appeals have addressed the issue and have adopted the rule.[29]

The principle underlying the rule has been articulated by the Second Circuit and adopted by other courts of appeals: "Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97

---

**28.** Although we previously have noted and rejected the tools of the trade rule, we did so only under the specific facts presented in a conspiracy to transport stolen property case and not with respect to narcotics. *See United States v. Miroff,* 606 F.2d 777, 781 (7th Cir.1979) ("While we do not feel that we are in a position to observe as the Second Circuit did in *Wiener* with regard to narcotics dealers that possessors of stolen goods transported in interstate commerce keep firearms on their premises as tools of the trade, we nevertheless find ... that there was relevance.") (citation omitted), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980). We think that conspiring to transport stolen property and conspiring to distribute narcotics are sufficiently dissimilar to permit us to distinguish *Miroff* on the facts. *See United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.) (courts recognize that narcotics laws offenders routinely use weapons to protect their illegal investment), *cert. denied,* 429 U.S. 820, 97 S.Ct.

66, 50 L.Ed.2d 80 (1976). Indeed, ten courts of appeals have applied the rule in the context of narcotics violations. *See infra* note 29.

**29.** *See, e.g., United States v. Rivera,* 844 F.2d 916, 926 (2d Cir.1988); *United States v. Crespo de Llano,* 838 F.2d 1006, 1018 (9th Cir.1987); *United States v. Cooper,* 827 F.2d 991, 995 (4th Cir.1987); *United States v. Cresta,* 825 F.2d 538, 554 (1st Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *United States v. Gorecki,* 813 F.2d 40, 43 (3d Cir.1987); *United States v. Payne,* 805 F.2d 1062, 1065–66 (D.C.Cir.1986) (per curiam); *United States v. Martin,* 794 F.2d 1531, 1533 (11th Cir.1986) (per curiam); *United States v. Sanko,* 787 F.2d 1249, 1251 & n. 6 (8th Cir.1986); *United States v. Arnott,* 704 F.2d 322, 326 (6th Cir.), *cert. denied,* 464 U.S. 948, 104 S.Ct. 364, 78 L.Ed.2d 325 (1983); *United States v. Perez,* 648 F.2d 219, 224 (5th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981).

S.Ct. 66, 50 L.Ed.2d 80 (1976). Here, both parties squarely have placed this issue before us for our resolution. The only argument that we can construe against applying a tools of the trade rule here is that the semi-automatic pistol was unloaded when found. Nevertheless, it is easy to imagine that since the pistol was found under the mattress of a bed, Ms. Rivera would be reticent to keep it loaded for fear of accidental discharge. Moreover, the Fourth Circuit recently held that a "make-believe Uzi weapon" was admissible as a tool of the narcotics trade. *United States v. Cooper,* 827 F.2d 991, 995 (4th Cir.1987). Accordingly, we now elect to join the ten other circuits that have embraced the *Wiener* court's reasoning, and find that the pistol was relevant as a tool of the trade.

### 3.

■ However, our analysis does not stop here. We must determine if the pistol should not have been admitted because it unduly prejudiced the appellant. *See* Fed. R.Evid. 403.[30]

We see no undue prejudice here. The district court did not refer explicitly to balancing prejudice against probativeness. However, there is no requirement that it do so. The court did so immediately prior to addressing the issue in the context of defendant Emma Garcia's "inquiry and desire to buy a gun." Tr. vol. 22 at 3853. Consequently, we think it is clear that the court conducted the appropriate analysis. We find no reason to disturb the court's sound exercise of discretion in admitting the pistol. As the government points out, the gun was not cumulative evidence; it raised the inference that the cocaine was valuable to Ms. Rivera and, therefore, that it was worth protecting. We cannot construe the admission of the weapon as confusing the jury. Nor do we find that the publication of the gun to the jury caused any undue prejudice.

### 4.

■ Even if the pistol should not have been admitted, however, we find that any error was harmless. We note that the government introduced evidence that Ms. Rivera's house was a storage depot of the narcotics distributed in the conspiracy. The government also introduced evidence that she distributed the narcotics herself, took telephone orders, collected money from the sale of narcotics, and discussed the narcotics business with other coconspirators. In short, even if the district court had excluded the pistol from evidence, her conviction would have been " 'inevitable' because the evidence against [her] was overwhelming." *United States v. Swiatek,* 819 F.2d 721, 728 (7th Cir.) (quoting *United States v. Beasley,* 809 F.2d 1273, 1280 (7th Cir.1987)), *cert. denied,* —— U.S. ——, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). Likewise, as already noted, the government presented overwhelming evidence of Mr. Alvarez' guilt, who adopts Ms. Rivera's arguments on this issue.

### Separate Punishment for Conspiracy and CCE

■ Mr. Castrellon stands convicted of both a CCE count and a conspiracy count. Our review of the record leaves us with substantial doubt that the district court was aware that separate punishment could not be inflicted for each count. *See Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). While the district court imposed concurrent sentences on each count, there remains the distinct possibility that the district court may have considered Mr. Castrellon's guilt on the conspiracy conviction in sentencing him on the CCE conviction.[31] Therefore,

---

**30.** Rule 403 of the Federal Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

**31.** *United States v. Bond,* 847 F.2d 1233 (7th Cir.1988), apparently overruled *sub silentio* that part of *United States v. Jefferson,* 714 F.2d 689 (7th Cir.1983), that required the vacation of both the conviction and sentence for conspiracy

we vacate Mr. Castrellon's sentence and remand his case to the district court for resentencing. *See United States v. Holzer*, 840 F.2d 1343, 1352 (7th Cir.1988).

### Conclusion

We have addressed the principal contentions of all the appellants. The matters that remain do not merit elaboration in this opinion. After a thorough examination of the record and all the submissions of the parties, we are convinced that the appellants received a fair trial. For the reasons set forth above, we affirm the judgment of the district court except as to Mr. Holguin's conviction on the CCE count. That conviction is reversed. Mr. Castrellon's sentence is vacated. Mr. Holguin's and Mr. Castrellon's cases are remanded to the district court for resentencing.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART

COFFEY, Circuit Judge, dissenting in part.

I concur with the majority's opinion in all respects, except two: I do not agree with the finding that the evidence regarding Torres and "the kid" was insufficient for the jury to conclude that defendant Holguin "organized or managed" their activities within the meaning of the Continuing Criminal Enterprise Statute (CCE), 21 U.S.C. § 848; and further, I do not agree with the conclusion that Holguin's CCE conviction must be vacated.

Under the CCE statute the government must prove five elements against Holguin:

"(1) A predicate offense violating a specified drug law (2) as part of a 'continuing series' of drug violations (3) that occurred while the defendant was acting in concert with five or more other people (4) to whom the defendant occupied the position of an organizer or manager and from which series the defendant (5) attained substantial income or resources."

when the defendant was also convicted of the CCE offense. *Id.* at 703 n. 28. *Bond* did not disturb, of course,—nor could it—the Supreme Court's holding in *Jeffers v. United States*, 432

*United States v. Markowski*, 772 F.2d 358, 360–61 (7th Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986). Since the jury found Holguin guilty of the charges brought under this statute, his burden in overturning the verdict on appeal is a heavy one. *See United States v. Nesbitt*, 852 F.2d 1502, 1508 (7th Cir.1988). The burden can be summarized in the following fashion: "As we have previously stated, and again reiterate, when reviewing the sufficiency of evidence ... we will affirm the trial court unless the evidence viewed in the light most favorable to the Government, could not have persuaded an [sic] rational trier of fact of defendant's guilt beyond a reasonable doubt." *Nesbitt*, at 1508 (quoting *United States v. Mayo*, 721 F.2d 1084, 1087 (7th Cir.1983)). It is well settled in this circuit that a "[d]efendant's challenge to the sufficiency of the evidence must be rejected if we find, 'after viewing the evidence in a light most favorable to the prosecution, [that] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Zanin*, 831 F.2d 740, 743 (7th Cir.1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Furthermore, "[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original).

My first point of departure with the majority opinion is the finding that the government failed to present sufficient evidence for the jury to conclude that Torres and "the kid" were "organized or managed" by Holguin. Although the government used circumstantial evidence to prove their case with regard to both Torres and "the kid," the important role that circumstantial evidence plays in drug

U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) that double punishment for these offenses is impermissible.

conspiracy cases cannot be minimized. As we stated in *Nesbitt*, "not only is the use of circumstantial evidence permissible, but 'circumstantial evidence "may be the *sole support* for a conviction."'" At 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion), which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)) (emphasis in *Nesbitt*).

In *Nesbitt* we went on to observe: "We recognize that in reviewing a guilty verdict based on circumstantial evidence, we must ensure that the verdict does 'not rest "solely on the piling of inference upon inference"; but neither should we view every bit of evidence in isolation.' *United States v. Guzzino*, 810 F.2d 687, 696–97 (7th Cir.1987), *petition for cert. filed* (March 27, 1987) (citing *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)). But '[t]he view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt.' *Borum v. United States*, 380 F.2d 595, 599 (D.C.Cir.1967) (former Chief Justice Burger dissenting))."

At 1511 (emphasis in original). As we further noted in *Nesbitt*: "If the government proves its case by circumstantial evidence, 'it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' ... The trier of fact is free to choose among various reasonable constructions of the evidence." *Id.* at 1510 (quoting *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)). This statement is based upon our recognition that "[i]n every criminal trial, each party asks the trier of fact to believe its witnesses, to weigh its evidence more heavily than the opposition's evidence, and to draw certain inferences from the basic facts and evidence in order to accept its hypothesis regarding the events in dispute." *United States v. Allen*, 797 F.2d 1395, 1399 (7th Cir.1986) (quoting *United States v. Moya*, 721 F.2d 606 (7th Cir.1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984)).

Review of a verdict based upon circumstantial evidence also requires special deference to a jury's common sense. As we stated in *Nesbitt*, at 1511:

"Juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See* [*United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)]. While '[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.* Likewise, a reviewing court must ' "use its experience with people and events [in determining] that the evidence correctly points to guilt [to guard] against the possibility"' of affirming a guilty verdict based solely on an ' "innocent or ambiguous inference."' [*United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)] (quoting *United States v. Kwitek*, 467 F.2d 1222, 1226 (7th Cir.), *cert. denied*, 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972))."

Applying these standards to this case, there is little question that a rational jury could and did determine beyond a reasonable doubt that Torres and "the kid" were "organized or managed" by Holguin. With respect to Torres, the government established that Torres' drug-related activities were under the control of Castrellon. The government also established that Holguin directed or organized some of Castrellon's activities, although Castrellon was "a big drug dealer in his own right." The government presented telephone conversations as evidence of the Holguin–Castrellon–Torres connection and according to Holguin's own brief, "[t]hat evidence viewed in a light most favorable to the prosecution show[s] that the speakers alleged to be Holguin and Castrellon agreed that something had to get done and [that] Castrellon stat[ed] that he would have his friend ... do it." Brief of Appellant Holguin at 96. The majority finds that under these circumstances "a

rational jury could not have concluded that Mr. Holguin organized, supervised or in any other way managed the activities of Ms. Torres."

On the contrary, as we noted in *United States v. Zanin,* "[c]onversations regarding drug transactions are rarely clear. A factfinder must always draw inferences from veiled allusions and code words." 831 F.2d 740, 744 (7th Cir.1987). In the present case, a reasonable jury could have drawn the inference that through Castrellon, Holguin directed or organized some of Torres' activities. The government was not required to prove personal contact between Holguin and Torres, nor that Holguin was the dominant supervisor of Torres (rather than Castrellon). The CCE statute requires only that Holguin occupy some managerial position with respect to Torres. *See United States v. Apodaca,* 843 F.2d 421, 426 (10th Cir.1988); *United States v. Becton,* 751 F.2d 250, 254–55 (8th Cir.), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1984).

With respect to "the kid," the government referenced a conversation between Castrellon and Rudy in which Castrellon stated that "he (apparently Holguin) was going to send the kid ... for what [Rudy] ... [w]as missing." While the majority recognizes that the statute does not make proof of specific identity mandatory, it speculates that "the kid" could be one of the other persons argued by the government to be under Holguin's control. Again referring to *Zanin,* juries are often required to draw inferences from conversations that are purposefully vague. 831 F.2d at 744. It is clear from *Zanin* that a possible innocent explanation of the conversation does not affect the validity of the jury's contrary conclusion:

> "Phyllis Zanin argues that all conversations in which she participated are susceptible to an innocent explanation. This may or may not be true—but it is irrelevant. The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt. The jury was entitled to draw reasonable inferences from the conversations."

*Id.* at 745. Similarly, given the choice between the various inferences in this case the "jury exercising well-reasoned judgment could very well conclude that the inculpatory inferences outweigh the exculpatory inferences that could be drawn from the evidence beyond a reasonable doubt." *Nesbitt,* at 1511. In this case a reasonable jury could and did logically determine from Castrellon's conversation with Rudy that "the kid" was, in fact, the seventh person under Holguin's control. Had the majority been the trier of fact, it may very well have found that this conversation was insufficient to show the existence of a seventh person, but such was not the case here. As we emphasized in *United States v. Giangrosso,* 779 F.2d 376, 382 (7th Cir. 1985): "This court is not the trier of fact and we are required to uphold the jury's verdict where '*any* rational trier of fact' could have found the defendant guilty of the crime." (emphasis added). We are required to "give deference to the trial jury's weighing of the evidence and its drawing of reasonable inferences." *United States v. Whaley,* 830 F.2d 1469, 1472 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1987); *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984); *United States v. Niemiec,* 611 F.2d 1207, 1211 (7th Cir.1980). "Only where the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Nesbitt,* at 1509 (quoting *Whaley,* 830 F.2d at 1472, which quoted, in turn, *United States v. Moore,* 764 F.2d 476, 478 (7th Cir.1985)).

My second point of departure is the majority's conclusion that Holguin's CCE conviction must be vacated. Under the reasoning of the discussion regarding Torres and "the kid," a reasonable jury could have concluded that Holguin had seven people under his control. Accordingly, the government proved the element under the CCE statute that Holguin "organized or managed" at least five people.

Even assuming for the moment that the majority is correct in its finding on the evidence regarding Torres and "the kid,"

there remain five individuals that the majority finds a reasonable jury could have concluded were under Holguin's control. The CCE statute requires only five. Viewed in the light most favorable to the prosecution, a reasonable jury could have found Holguin guilty under the statute based on these five people alone. Under this limited standard of review, I must, therefore, respectfully dissent.